**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

DANIEL G. WOODS,

                Plaintiff,


v.                             **MEMORANDUM OF LAW & ORDER**
                                 Civil File No. 05-987 (MJD/RLE)

PRO VIDEO PRODUCTIONS, INC.,
TOM LIVINGSTON, and
JACK LIND,

                Defendants.
_____

Kyle H. Torvinen and Parrish Jones, Knudson Gee Torvinen & Watson, Counsel for Plaintiff Daniel G. Woods.

John D. Kelly, Hanft Fride PA, Counsel for Defendants Pro Video Productions, Inc., Tom Livingston, and Jack Lind.
_____

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary

Judgment.  [Docket No. 20]  The Court heard oral argument on July 12, 2006.

## II.   FACTUAL BACKGROUND

### A.    Parties

Plaintiff Daniel Woods and Defendants Tom Livingston and Jack Lind are

filmmakers.  Defendant Pro Video Productions, Inc. ("Pro Video"), is a company

that was formed by Livingston and Lind as a partnership in 1982 and incorporated in 1989.  Pro Video and Woods worked together on several commercial projects in the 1980's and early 1990's, and again during the period 1997 through 2002.

### B.     Project Fatal Choices/NHTSA Project

In 1997, two representatives from the Minnesota Department of Transportation ("MDOT") returned from a trip to Australia, where they had viewed an Australian public road safety ad campaign.  John Bray, with MDOT, contacted Woods seeking to meet with Woods and Pro Video regarding mimicking high impact public service announcements from Australia.

Woods, Livingston, and Lind began planning such a large-scale campaign dubbed Project Fatal Choices.  They hoped to create a project that would generate approximately three million dollars in revenue.  Woods claims that, after the initial meeting, he began writing scripts and thinking about how to organize the project. He also contacted persons involved in the Australian public service announcement project.

Woods and Pro Video soon determined that the State of Minnesota could not fund such a large project and began to seek private funding and financial backing from the National Highway Traffic Safety Administration ("NHTSA"). However, the NHTSA rejected their unsolicited proposal.

Pro Video's lobbyist, Sante Esposito, informed them that the NHTSA might

entertain a smaller scale research project, so they prepared a new proposal for the NHTSA.  By June 2001, Woods had provided a summary of his research to Defendants.

Before awarding the contract, the NHTSA required Pro Video to provide a statement of work based on an NHTSA template.  Based on that template, Woods created a draft Statement of Work, which he shared with others at Pro Video.  On July 12, 2001, Woods e-mailed a draft Statement of Work to Doug Gurin at the NHTSA with the comment, "Please find attached a draft Statement of Work which incorporates your key input of yesterday."  Gurin then revised the draft Statement of Work "with a heavy hand."

In February 2002, Woods and Livingston traveled to Washington to meet with the NHTSA.  After the meeting, which included Woods, Livingston, and Esposito, the NHTSA revised the Statement of Work to reflect the meeting discussion.

On August 1, 2002, the NHTSA awarded Pro Video a contract for hire for approximately $180,000 for a research project studying whether the Australian ad campaign caused a significant reduction in highway traffic deaths ("Cooperative Agreement").  By the time the NHTSA awarded the contract, Pro Video and Woods had a falling out, and Woods was no longer participating in the project. The NHTSA set the boundaries of the research project, including whom to contact

in Australia and which interview questions to ask.  Livingston, Gudrun Hartig, a

Pro Video employee, and Alex Wagenaar, traveled to Australia for three weeks to

interview those involved in the Australian ad campaign.  The final research report

was principally authored by Hartig, based on the interviews and the statistical

information that she had gathered in Australia.  Pro Video's final research report

for the NHTSA was entitled "Impact of Traffic Safety Paid Advertising Campaigns

in Victoria and New South Wales, Australia, 1989-2001" ("Final Report").

    **C.**    **Changing Faces of Aviation/FAA Project**

In 1999, Livingston heard Congressman Oberstar give a speech on

improvements to the air transportation system.  This gave Livingston the idea of

creating a documentary on how the air transportation system had become safer

and more efficient.  The day of the speech, Livingston had lunch with Woods and

discussed turning the speech into a possible project.  Livingston also  discussed the

idea with Pro Video lobbyist, Esposito, who was then working for Pro Video on the

NHTSA project.  The idea for a four-part documentary, dubbed "Changing Face of

Aviation," was submitted to the Federal Aviation Administration ("FAA") in 2001.


After September 11, 2001, the FAA was less interested in funding a

substantial documentary.  However, it did indicate that it might fund a shorter

documentary dealing with efficiency improvements in aviation.

In February 2002, Woods and Livingston met with the FAA in Washington, D.C., regarding the smaller scale project. Before the meeting, Livingston and Woods met with Esposito in his office and revised the treatment and production plan. At the meeting with the FAA, Livingston submitted a proposal, including the revised treatment, to the FAA.

On April 18, 2002, and again on April 25, 2002, Woods submitted newly revised treatments to the FAA for a twenty-to-thirty-minute video with a budget of $275,000. These revisions reflected comments by the FAA.

In July 2002, Pro Video obtained an FAA contract for $275,000 to create a twenty-five-minute documentary on efficiency improvements in the air transportation system. Before the FAA awarded the contract, Pro Video and Woods had a falling out and Woods was no longer involved in the project.

The final documentary was based on a treatment created by filmmaker John Hanson, written after the FAA contract was executed. The documentary was filmed in five or six different locations after site visits and interviews.

**D.      Dispute Between Woods and Pro Video**

Throughout the NHTSA and FAA projects, Woods wanted Pro Video to create a business structure with him to carry out the projects. However, Defendants did not want to enter into a business structure until funding was approved and the government contracts were awarded.

Woods claims that by November 1, 2000, he had spent over nine hundred hours on the NHTSA and FAA projects.  As he worked on the projects, he copyrighted documents representing his background research.

On September 30, 2001, Woods wrote a letter to Livingston, as president of Pro Video, stating:

> The absence of a well-defined, explicit business agreement as the foundation for our work together on Project Fatal Choices and 'The Changing Face of Aviation' is unacceptable to me.
>
> * * *
>
> This letter constitutes notice to you that my intellectual property, or any work based on or deriving from my intellectual property, may not be used by Pro Video Productions, Inc., or any other individual or entity, for any purpose, without my specific written agreement.  I have previously provided you with complete sets of the materials submitted by me for copyright registration.  . . .  You will also be provided with complete sets of the additional materials that I will shortly be submitting for copyright registration.

Woods and Defendants continued to negotiate as they worked together.  Despite ongoing negotiations, they could not resolve their dispute.  Woods was not compensated for his work on either project.

### E.    Wisconsin Litigation

In 2003, Woods and his company, Clarity Films, Inc., sued Pro Video, Livingston, Lind, Hanson, and Northern Pictures, Inc., in Douglas County Circuit Court in Wisconsin, alleging copyright infringement, breach of contract, misrepresentation, promissory estoppel, and unjust enrichment.  The copyright

6

infringement claim was dismissed because it was within the exclusive subject matter jurisdiction of the federal court.  The remaining state law claims were tried in a bench trial in January 2006.  On May 9, 2006, the court issued its decision, finding for Defendants on the breach of contract, misrepresentation, and promissory estoppel.  The court found for Woods on his unjust enrichment claim and awarded $56,750 in damages.

### F.    Procedural Background

Plaintiff Woods filed this Complaint against Defendants Pro Video Productions, Inc., Livingston, and Lind, on May 23, 2005.  He alleges Count I: Copyright Infringement of "Project Fatal Choices," and Count II: Copyright Infringement of "The Changing Face of Aviation" a/k/a "Aviation Efficiency."  In his Complaint, Woods alleges infringement of hundreds of documents.  However, in the context of this summary judgment motion, Woods focuses on a handful of documents.

In Count I, he focuses on alleged infringement of his July 12, 2001 Statement of Work by the NHTSA Cooperative Agreement and the Final Report. He also alleges infringement upon a collection of documents found in Exhibit D to the Affidavit of John D. Kelly.

In Count II, Woods focuses on alleged infringement of his April 25, 2002, Treatment by the final FAA Memorandum Agreement and film.

## III.   DISCUSSION

### A.   Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

To establish copyright infringement, Woods must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991) (citation omitted).  Woods bears the burden of proving both elements.  Taylor Corp. v. Four Seasons Greetings, LLC, 403 F.3d 958, 962-63 (8th Cir. 2005).

### B.   Project Fatal Choices/NHTSA Project

#### 1.   Whether the Woods's Writings Are Entitled to Copyright Protection

Defendants assert that Woods's claim of copyright infringement based on Project Fatal Choices cannot survive because his works are not entitled to

8

copyright protection.  Copyright law protects originality, not effort and "sweat of the brow."  <u>Feist Publ'ns, Inc.</u>, 499 U.S. at 359-60.  Further, copyright protection does not extend to ideas, concepts, or discoveries.  17 U.S.C. § 102(b).  If an idea is recorded at a general level of abstraction, little of that work will be protectable.  <u>Attia v. Soc'y of New York Hosp.</u>, 201 F.3d 50, 55 (2d Cir. 1999).  However, compilation of fact can entail originality.  <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 547 (1985).  "What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments."  <u>Wainwright Sec., Inc. v. Wall St. Transcript Corp.</u>, 558 F.2d 91, 95-96 (2d Cir. 1977).

Much of Woods's work is not protected by copyright.  Particular facts that he found regarding the Australian ad campaign, broad, general questions that he posed, such as identifying underlying principles that impacted the results in the Australian ad campaign, and lists of panelists' credentials are either too abstract or factual to warrant protection.  However, Woods's arrangement of his ideas and his manner of expression could be entitled to copyright protection.  The Court's decision on summary judgment is based on the next question, whether Defendants copied protected aspects of Woods's work.

**2.    Whether Defendants Copied Protected Elements of Woods's Works**

### a.   Introduction

Woods may prove copying by either direct evidence of copying or by proving that Defendants had access to the copyrighted works and there is substantial similarity between the copyrighted works and Defendants' works. Taylor Corp. v. Four Seasons Greetings, LLC, 403 F.3d 958, 964 (8th Cir. 2005). The parties agree that Defendants had access to Woods's work.  The Court must determine whether substantial similarity exists.

> Determination of substantial similarity involves a two-step analysis. There must be substantial similarity not only of the general ideas but of the expressions of those ideas as well.  First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works.  Second, if there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression.
>
> Thus, . . . we first determine whether the details of the works contain objective similarities, and if they do, then we examine the works to ascertain if they are so dissimilar that ordinary, reasonable minds [can]not differ as to the absence of substantial similarity in expression.

Moore v. Columbia Pictures Indus., Inc., 972 F.2d 939, 945 (8th Cir. 1992) (citations omitted).

"The discovery of a fact, regardless of the quantum of labor and expense, is simply not the work of an author."  Applied Innovations, Inc. v. Regents of the Univ. of Minn., 876 F.2d 626, 636 (8th Cir. 1989) (citation omitted).  "Because authors who wish to express ideas in factual works are usually confined to a

10

narrow range of expression[,] . . . similarity of expression may have to amount to verbatim reproduction or very close paraphrasing before a factual work will be deemed infringed." Id. (citation omitted).  Additionally, certain elements of a work are not protectable, such as

> "ideas," as distinguished from the "expression" of those ideas; facts, historical events, or other information over which no individual is entitled to claim a monopoly (though original compilations or arrangements of facts may be protectable); elements borrowed from another author or from the "public domain"; instances in which a particular "expression" at issue "merges" with the "idea" being expressed; and/or a similar instance in which the form of the "expression" is so "standard" in the treatment of a given "idea" that it constitutes a scenes a faire, or a "scene which must be done."

Idema v. Dreamworks, Inc., 162 F. Supp. 2d 1129, 1176-77 (C.D. Cal. 2001) (footnotes and citation omitted).

Woods's works contain some objective similarities in detail to the Cooperative Agreement and the Final Report.  All address the same issue - the impact of the same Australian public safety campaign on traffic deaths and injuries - and seek to address that issue through research into Australian sources.  The Final Report cites to some of the same sources as Woods cites in his works, such as a January 8, 1996 email from Len Quinhivian and Report Number 177 from the Monash University Accident Research Centre.  However, general ideas, or facts or elements borrowed from another source, are not protectable under copyright law. See Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 121 (8th Cir. 1987)

(upholding grant of summary judgment when "apparent similarities are either

noncopyrightable ideas, scenes a faire, or of an insubstantial nature").

Additionally, the Court concludes that the "works express their ideas so differently

that ordinary, reasonable minds could not find them substantially similar."

Schoolhouse, Inc. v. Anderson, 275 F.3d 726, 731 (8th Cir. 2002).  The Court now

addresses the specific works allegedly infringed.

### b.    Statement of Work

The July 12 Statement of Work is not substantially similar to the

Cooperative Agreement or the Final Report.  The idea of conducting research on a

particular advertising campaign in Australia is not a protectable expression.

As evidence that Woods's Statement of Work is substantially similar to the

final Cooperative Agreement, Woods notes examples such as the following: the

July 12, 2001 Statement of Work proposed to "document, analyze, and compare

the pros, cons, costs and benefits of the diverse traffic safety campaigns of

Australia and possibly other countries between 1989 and 2001."  The Cooperative

Agreement served to "document and determine the benefits and costs of traffic

safety advertising campaigns within Victoria, which had a graphic ad campaign,

and New South Wales, which did not have a graphic ad campaign, between 1989

and 2001."

The final Cooperative Agreement does not copy protected language or

expressive themes from the Statement of Work.  The examples of quotations that Woods provides are not substantially similar.  The Cooperative Agreement does copy Woods's general ideas, such as documenting the auto safety campaigns in Australia during a particular time period, conducting a literature review, determining the background demographic and political information of Australia, and interviewing Australian experts.  However, copying of ideas, and of the basic steps to any research project, is not barred by the Copyright Act.  Additionally, some manners of expression and organization are repeated in the final Cooperative Agreement; however "[s]imilarity in expression cannot be used to show copyright infringement when there is only one way or only a few ways of expressing an idea.  Numerous courts have cited this principle in denying copyright infringement claims to prevent an author from monopolizing an idea merely by copyrighting a few expressions of it."  Schoolhouse, Inc. v. Anderson, 275 F.3d 726, 730 (8th Cir. 2002) (citations omitted).  Any NHTSA statement of work to conduct research regarding the Australian safety campaign will inevitably contain some similarity of expression.  The Court concludes that, whether viewing the particular phrases cited by Woods or viewing the works as a whole, any similarity of expression does not begin to approach the type of "verbatim reproduction or very close paraphrasing [necessary] before a factual work will be deemed infringed."  Applied Innovations, Inc. v. Regents of the Univ. of Minn.,

13

876 F.2d 626, 636 (8th Cir. 1989).

Similarly, while the original Statement of Work does pose some of the broad questions that were answered in the Final Report, the Final Report is an extensive research report, based mostly on independent interview research conducted after Woods's involvement with the project ceased, expressed in dissimilar language, organization, and format. The Court concludes that the works could not meet either prong of the substantial similarity test.

### c.    Other Works by Woods and Final Report

Woods also claims that Defendants incorporated an amalgam of his copyrighted works into their Final Report, "Impact on Traffic Safety Paid Advertising Campaigns in Victoria and New South Wales, Australia, 1989-2001." Woods admits that some of his work researching the proposed project was derived from other research. However, he notes that derivative work is entitled to copyright protection, although the protection "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103.

Woods claims that the following works were infringement by the Final Report:

> "Proposal Action Step Outline," a one-page list of general "action
> steps" for approaching research for a study of the Australian public

14

service announcements;

"Research Objectives," a one-page outline describing the possible research project in general terms;

"Comparison of the Australian Experience and the NHTSA Experience in the Use of Television as a Public Education Tool, and the Application of Lessons Learned in Project Fatal Choices," an outline summarizing the use of traffic safety ads in Australia, analyzing an Australian-type campaign in the United States, and advocating for a particular approach to such ads in the United States;

"Briefing paper Outline: Learning from the Australian Traffic Safety Experience," an outline of a little more than two pages summarizing the Australian ad campaign and its possible application to the United States;

"Project Fatal Choices Design Team Presentation," a two-page document containing panelist information and an outline of a presentation regarding the Australian ad campaign and its possible application to the United States;

"Draft NSC Presentation Outline," a one-page outline for a presentation regarding the Australian ad campaign and its possible application to the United States;

"Au Crash Info Summary," a compilation of Woods's research on the Australian ad campaign with summaries and citations;

two flow charts depicting an approach to production of an American ad campaign based on the Australian campaign;

"Project Fatal Choices: Planning Framework," an outline of a work plan to study to Australian ad campaign and produce a similar campaign for the United States;

"Fatal Choices: What Do We Know and Where Do We Go from Here?," an outline regarding the project's attempts to obtain financing, evaluating strengths and weaknesses of the Fatal Choices project, and stating project goals; and

"Thinking Out Loud," an outline regarding the parameters of the
project and attempts to build a relationship with the insurance
industry.

Woods also alleges infringement of "Fatal Choices: A Public/Private Partnership,"

a proposal to create a road safety campaign in Minnesota based on the Australian

campaign; and "Strategy Regarding $125,000 Proposal," a memorandum

regarding funding strategy and a project plan.

These various documents do contain some protected elements, such as their

organization, expressive language, and, in some cases, conclusions.  However, no

verbatim copying or close paraphrasing of these documents occurred and the

documents, other than the "Au Crash Info Summary," are mostly comprised on

unprotected broad, abstract ideas.  The points of comparison that Woods provides

for these works consist of typical questions that any researcher would ask in such

a research project, such as "Identify underlying principals impacting results,"

which were "answered" in the Final Report.  These answers represent

independent research and dissimilar expression.  Similarly, Woods's organization

of the proposed project found in various outlines and charts is not similar to the

organization found in the Final Report.

"Au Crash Info Summary," merely lists facts from other sources.  Facts that

Woods researched and discovered in the public domain that were used in the

Final Report are not protected, but the arrangement and phrasing of those facts

16

could be protected.  However, the order and expression of these facts in the Final

Report is not similar to that in Woods's documents.  Furthermore, the facts and

sources used in Woods's work that also are used in the Final Report are a small

percentage of the facts and sources used in the Final Report, much of which is

based on independent interviews.

Although Defendants used some of the broad ideas and facts contained in

Woods's documents in the Final Report, they did not use protected elements of his

documents.  Further, no reasonable person could find that the works contain

substantially similar expression.

The Court grants Defendants' motion for summary judgment on Count I of

the Complaint.  Because the Court determines that Woods's works were not

copied by Defendants, it does not reach Defendants' alternative arguments that an

implied nonexclusive license existed or that Woods did not author the works

himself.

### C.      Changing Faces of Aviation/FAA Project

#### 1.      Whether Woods's Works Are Protected

Defendants assert, as they did in the NHTSA project, that Woods's April 25,

2002 Treatment simply contains unoriginal facts or broad ideas that cannot be

protected.  While Woods's Treatment is short and contains broad language, it is

not so short or unexpressive as to be entirely excepted from copyright protection.

17

The Court must determine whether protected elements of the Treatment were copied.

### 2.   Whether Defendants Copied Woods' Protected Works

### a.   Infringement by the Final FAA Documentary

Woods asserts that the April 25, 2002 Treatment was infringed by the final Pro Video-FAA documentary; however, he provides no points of comparison between the documentary and his works and makes no arguments regarding any particular substantial similarity to his works.  The parties have not submitted a copy of the final documentary to the Court.  Additionally, Woods himself testified that "[t]he important creative elements [from the April 25, 2002 Treatment] were absent generally from the final film."  (Woods Trial Tr., Ex. F to Kelly Aff., at 17.)

A plaintiff opposing summary judgment "must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005) (citation omitted). "[I]n order to survive summary judgment, [the plaintiff] must not only demonstrate access but also must establish a substantial similarity between his work and the alleged copy. " Moore v. Columbia Pictures Indus., Inc., 972 F.2d 939, 945 (8th Cir. 1992).  See also Frybarger v. Int'l Bus. Machs. Corp., 812 F.2d 525, 528 (9th Cir. 1987) ("Because plaintiff bears the burden of proving that the works at issue are substantially similar in a copyright infringement case, summary

18

judgment for defendant is appropriate when plaintiff fails to make a sufficient showing that the ideas and expressive elements of the works are substantially similar after defendant has properly identified in a motion for summary judgment that plaintiff has failed to do so.") (citations omitted).  The Court concludes that Woods has failed to show a genuine issue of material fact as to the substantial similarity between his Treatment and the final film.

### b.    Infringement by the Memorandum of Agreement

Woods also argues that the FAA contract was obtained through use of his copyrighted material.  He claims that Attachment 1 to the FAA-Pro Video Memorandum of Agreement, dated July 12, 2002, is copied from a document he authored and submitted to the FAA entitled "Treatment: Aviation Efficiency Documentary," dated April 25, 2002.  Woods asserts that similarities include his suggestions that the video be twenty to thirty minutes long, that it focus on the inter-connectivity of the aerospace industry combined to make it more efficient, that it contain images of the National Command Center, that it include a weather scenario revealing how weather, runway, and air traffic control issues can combine to create congestion and delay, and that the interactive nature of congestion be revealed through interviews with members of the aviation community.  Both documents also contain the same "goals" and "issues," including instances of identical wording.

19

The Court concludes that the comparisons that Woods makes between his April 25 Treatment and the Memorandum of Agreement do not support a viable copyright claim.  The length of the video, for example, cannot be a copyrighted.  Further, the idea of focusing on aviation efficiency, derived from Congressman Oberstar's speech, not from Woods's original expression, makes the identical elements, such as revealing collaboration and focusing on inter-connectivity and images of the National Command Center, basic, non-original elements that would be included in any such documentary on the subject.  "[A] copyright offers no protection to 'scènes à faire', i.e., incidents, characters, or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic."  Kretschmer v. Warner Bros., No. 93 CIV. 1730 (CSH), 1994 WL 259814, at *7 (S.D.N.Y. June 8, 1994) (citing Hoehling v. Universal City Studios, 618 F.2d 972, 979 (2d Cir. 1980)).  For example, "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often recurring themes of police fiction."  Walker v. Time Life Films, Inc., 784 F.2d 44, 50 (2d Cir.1986), cited in Kretschmer, at *7.  Similarly, the idea of basing the video on interviews with members of the aviation community, such as pilots, passengers, and air traffic controllers, is too broad and unoriginal to be protected.

   **c.**  **Infringement by Pro Video's August 13, 2002 Treatment and by Pro Video's October 22, 2002 Final FAA Treatment and Production Plan**

Woods also provides a "Points of Comparison" of his April 25, 2002 Treatment and an August 13, 2002 Treatment and an October 22, 2002 Treatment and Production Plan.  The Points of Comparison does not provide the Court with copies of the August 13, 2002 Treatment or the October 22, 2002 Treatment and Production Plan from which to judge substantial similarity. Furthermore, the comparisons provided in the Points of Comparison chart cannot support a finding of substantial similarity.  As explained in the previous section, broad ideas and scenes a faire are not subject to copyright protection.

Thus, the Court grants Defendants' motion for summary judgment on Count II of the Complaint.

Because the Court determines that no protected portions of Woods's work were copied, it does not need to reach Defendants' other arguments, such as whether Woods solely authored his claimed works, whether the NHTSA and FAA, not Defendants, copied Woods's work, and whether an implied license to use Woods's work existed.  As the Court noted at the outset of this Opinion, copyright law protects originality, not effort and sweat of the brow.  Another court has already determined that Woods is entitled to compensation for the effort and research that he provided to Defendants in connection with the NHTSA and FAA projects.  However, by using Woods's efforts, Defendants did not commit

21

copyright infringement.

According, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Defendants' Motion for Summary Judgment [Docket No. 20] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 24, 2006                    s / Michael J. Davis
                                          Judge Michael J. Davis
                                          United States District Court